## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHABAD LUBAVITCH OF THE BEACHES, INC., | |
| Plaintiff, | Civil Action No. __2:22-cv-04141__ |
| v. | JURY TRIAL REQUESTED |
| INCORPORATED VILLAGE OF ATLANTIC BEACH; MAYOR GEORGE PAPPAS; EDWARD A. SULLIVAN; LINDA L. BAESSLER; ANDREW J. RUBIN; and PATRICIA BEAUMONT, | |
| Defendants. | |

### INTRODUCTION

1.      In November 2021, Chabad Lubavitch of the Beaches ("Chabad of the Beaches")—an organization affiliated with the Hasidic Jewish movement Chabad Lubavitch—purchased 2025 Park Street in Atlantic Beach, New York to open a center for conducting Jewish worship, education, and other forms of outreach to the Jewish community central to Chabad Lubavitch's mission of deepening Jews' commitment to Judaism.

2.      At the time of Chabad of the Beaches' purchase, 2025 Park Street, which is located less than one block from Atlantic Beach's town hall, had been unoccupied for several years and had been available for lease or sale for nearly two years.  During the

entire period 2025 Park Street was on the market, officials from Atlantic Beach never once offered to purchase the property.

3.      However, less than a month after Chabad of the Beaches' purchase—and less than two weeks after Chabad of the Beaches held an outdoor menorah lighting at 2025 Park Street to celebrate Hannukah—Atlantic Beach officials suddenly, and without explanation, decided not only that they needed the property to build a community center, lifeguard operations center, and park, but also that this need was so exigent that Atlantic Beach had to seize 2025 Park Street and a neighboring property through eminent domain.

4.      In January 2022, at the public hearing required under New York's Eminent Domain Procedure Law, Atlantic Beach residents raised numerous questions and concerns about the Village's plans.  Some questioned the need for a community center when the town hall had been intended to serve that purpose and had staff and space to host gatherings.

5.      Some asked why Atlantic Beach did not just build the desired facilities on one of the several vacant lots it already owned, two of which were directly across the street from the existing recreational center, closer to the beach than 2025 Park Street, and—unlike 2025 Park Street—adjacent to parking.

6.      And some residents questioned the officials' true motives, noting that the only thing that had changed between when the officials showed no interest in 2025 Park Street and when they decided they had to seize it was the property's purchase by Chabad of the Beaches, a Hasidic Jewish organization.

7.    At no point during the public hearing, and at no point since, have Atlantic Beach officials publicly answered these questions.

8.    Nevertheless, in February 2022, Atlantic Beach officials voted to oust Chabad of the Beaches from 2025 Park Street by taking the property through eminent domain.  The Village's petition to take title to the property is currently pending in the New York Supreme Court, though as of the date of this complaint, the Village has yet to make any offer of compensation.

9.    Under the Constitution and laws of the United States, Atlantic Beach's targeted use of eminent domain against Chabad of the Beaches cannot stand.

10.    The actions of Atlantic Beach and its officials violate Chabad of the Beaches' rights under the Free Exercise Clause and Establishment Clause of the First Amendment, the Takings Clause of the Fifth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act. Those actions discriminate against Chabad of the Beaches on the basis of religion, advance no compelling government interest, and are far from the least restrictive means of advancing the Village's purported—albeit pretextual—goals.

11.    Chabad of the Beaches accordingly seeks declaratory and injunctive relief to prevent Atlantic Beach from violating its fundamental rights by abusively using eminent domain to take its property.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

13.     This Court has authority to issue the relief sought pursuant to 28 U.S.C. §§ 1343(a), 2201, and 2202 and 42 U.S.C. §§ 1983, 1988, and 2000cc-2.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).  All Defendants maintain offices and perform their official duties in this district, a substantial part of the events giving rise to the claims occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

## PARTIES

15.     Plaintiff Chabad Lubavitch of the Beaches, Inc. is a non-profit religious organization affiliated with Chabad Lubavitch, a worldwide Hasidic movement. Plaintiff's principal location is 570 West Walnut, Long Beach, NY 11561, where it operates a center for Jewish life that serves the Jewish communities of Long Beach, Lido Beach, and Atlantic Beach by promoting and strengthening Jewish awareness, observance, and community though religious, educational, cultural, and social activities.

16.     Defendant Incorporated Village of Atlantic Beach ("Village" or "Atlantic Beach") is an incorporated community on Long Beach Barrier Island in Nassau County, New York.  The Village maintains an office at 65 The Plaza, Atlantic Beach, NY 11509.

17.     Defendant George J. Pappas is mayor of the Village of Atlantic Beach, in which capacity he voted to authorize the Village's taking of Chabad's property through eminent domain.

18.     Defendants Edward A. Sullivan, Linda L. Baessler, Andrew J. Rubin, and Patricia Beaumont are trustees of the Village of Atlantic Beach, in which capacities they voted to authorize the Village's taking of Chabad's property through eminent domain.

## FACTS

19.     Chabad Lubavitch is a branch of Hasidic Judaism founded in the late eighteenth century by Rabbi Schneur Zalman.  The word "Chabad" is an acronym for the Hebrew words *chochmah* (wisdom), *binah* (comprehension), and *da'at* (knowledge). "Lubavitch" is the Yiddish word for Lyubavichi, the Russian village where the Chabad Lubavitch movement was based for nearly a century.

20.     Following World War I, to escape persecution by the Bolsheviks, Chabad Lubavitch moved its center first to Riga, Latvia, and then to Warsaw, Poland.  In 1940, with the outbreak of World War II, the movement's leadership moved once again, this time to the United States.  Since then, Chabad Lubavitch has been headquartered in the Crown Heights neighborhood of Brooklyn.

21.     Adherents of Chabad Lubavitch strictly observe Jewish law, known as *halakha*.

22.     One of Chabad Lubavitch's central tenets is outreach to the broader Jewish world, including non-Orthodox and secular Jews.  At the heart of Chabad Lubavitch's commitment to outreach is the principle of *Ahavat Yisrael*—love of all Jews.

23.    Chabad Lubavitch carries outs its mission of Jewish outreach principally through emissaries known as *shluchim*. *Shluchim* are husband-and-wife teams who, as young married couples, permanently move to areas with a Jewish presence to set up Chabad Houses, from which they conduct a wide range of outreach activities to the broader Jewish community. Such activities, which may vary from Chabad House to Chabad House, generally include religious services, Torah study, religious instruction, and holiday celebrations. They may also include running Jewish day schools, summer camps, after-school programs, or social service organizations.

24.    Through these outreach activities, Chabad Lubavitch aims to bring Jews closer to God and their Jewish heritage and to strengthen Jews' commitment to Judaism. This goal is known as *kiruv*, a term derived from the Hebrew word for "bringing close," and Chabad Lubavitch's emphasis on outreach, especially through its *shluchim*, is known as the Kiruv Movement.

25.    Today, Chabad Lubavitch is one of the most influential and far-reaching Jewish organizations in the world, with over 2,000 emissary families in the United States, over 5,000 worldwide, and over 3,500 institutions located in over 100 countries.

26.    Plaintiff Chabad of the Beaches was founded 17 years ago by *shluchim* Rabbi Eli and Beila Goodman to serve the Jewish population of Long Beach Barrier Island and the surrounding towns.

27.    Long Beach Barrier Island is an approximately 10-mile wide island running along the southern coast of Long Island. From west to east, Long Beach Barrier Island comprises the communities of Atlantic Beach, Long Beach, and Lido Beach. Atlantic

Beach sits across a narrow waterway from, and is connected by a bridge to, the Long Island mainland.

28.     Chabad of the Beaches currently operates a center for Jewish life in Long Beach offering a wide range of religious, educational, cultural, and social programming to the Jewish community of Long Beach Barrier Island.  In addition to running a synagogue, Chabad of the Beaches runs a Hebrew school, adult Jewish education programs, young Jewish professional events, programming for Jewish teens, and women's programming.

29.     Last fall, to expand its offerings for the local community, Chabad of the Beaches purchased a property located at 2025 Park Street (the "Property" or "2025 Park Street") in Atlantic Beach for $950,000.  The 9,995 square-foot property—which is down the block from the Village offices at 65 The Plaza, Atlantic Beach—houses a 1,698 square-foot building that was formerly a Capital One bank.  Chabad of the Beaches' deed was recorded on November 18, 2021 in the Nassau County Clerk's Office.

30.     When Chabad of the Beaches purchased the Property, it had been vacant for at least three years and for lease and/or sale since December 2019.  During the bulk of that time, the Property had "For Sale" signs posted in its front yard, facing Park Street and Albany Street.  The Property had also been listed for sale on MLS, as well as Zillow, Redfin, and other real estate websites.

31.     An image of the Property from Google maps, taken while the Property was for sale, is included below:

FIGURE 1



32.    During the entire time that the Property was listed for sale, the Village never made an offer to purchase the Property from its then-owner.

33.    Chabad of the Beaches acquired the Property with the intent of opening a Chabad House offering religious services, religious education, and other Jewish outreach activities.  In addition to using the Property to expand its religious, educational, and social programming, Chabad of the Beaches planned to use the Property to provide kosher food for the Jewish community.

34.    As is common at other Chabad Houses around the country, Chabad of the Beaches also planned to make the Property available to the broader Atlantic Beach community as a space for meetings and gatherings, when it was not in use for religious purposes.

35.    Rabbi Goodman selected the property because of its location at the foot of the bridge that serves as the main entry point to Long Beach Barrier Island.  By virtue of its high visibility to the residents of the barrier island, this location promised to promote awareness of Chabad of the Beaches among the island's large Jewish population,

especially among secular and unaffiliated Jews who might not otherwise know of Chabad of the Beaches' presence.

36.     On December 2, 2021, two weeks after completing its purchase of the Property, Chabad of the Beaches held a menorah lighting at the Property to celebrate Hannukah.

37.     For 17 years, Chabad of the Beaches has held annual menorah lightings in neighboring Long Beach, which that town's elected officials have consistently attended.

38.     Consistent with that practice, in advance of the menorah lighting at 2025 Park Street, Rabbi Goodman emailed Atlantic Beach's official account to invite Mayor Pappas to light the center candle "to bring blessing and light to the Village of Atlantic Beach and the entire Barrier Island."

39.     At the ceremony on December 2, participants lit a twelve-foot menorah and sang religious songs.  But, despite the invitation, no Atlantic Beach officials attended.

40.     Upon information and belief, Mayor Pappas either watched the lighting from a distance or heard about the ceremony from local residents.

41.     Upon information and belief, in response to complaints about the ceremony, Mayor Pappas stated that he had a plan to prevent Chabad of the Beaches from remaining in Atlantic Beach.

42.     Mere days later, on December 13, 2021, the mayor had put his plan into action.  That evening, the Village's Board of Trustees (the Village's governing body, comprising the mayor and four trustees) unanimously adopted a resolution to begin the process of seizing the Property and the neighboring lot at 2035 Park Street by eminent

domain (collectively, the "Park Street Properties").  The trustees and mayor set January 10, 2022, as the date to hold a public hearing on the issue.

43.    In published notices of the upcoming hearing, the Village announced its intention to use the Park Street Properties as a "recreation facility, community center and lifeguard beach operations facility."

44.    The Village held the public hearing as scheduled, on January 10, 2022.

45.    At the hearing, the Village's attorney, Joshua Rikon, stated that the Village planned to use the Property as a "recreational facility and community center with lifeguard beach operations," and to use the neighboring parcel as a community park.  *See* Ex. 1 at 9:8–15.

46.    Mr. Rikon further stated that "[n]o alternative locations were considered for the project."  *Id.* at 9:15–16.

47.    The Village's preference for having recreational facilities instead of a religious institution at the Property reflects official Village policy.  One current Atlantic Beach zoning ordinance, in particular, regulates "religious and educational uses" to address "the concerns of the surrounding Village inhabitants about the potential adverse effects on the quality of life that these uses may engender."  § 250-108.1(A)(1).[1]  The ordinance aims to regulate religious uses with a purported "net negative impact on the surrounding neighborhood."  § 250-108.1(A)(2).  To that end, it requires "[a] house of worship or other place regularly and primarily devoted to religious practice," § 250-

---

[1] The Village zoning ordinance is available at https://ecode360.com/7204110.

108.1(B), to apply for a special permit before establishing or expanding a religious use in the Village, § 250-108.1(A)(3) and § 250-108.1(C)(1). It notes that the Village Board of Appeals may deny such an application if it believes that a proposed religious use "will sufficiently detract from the public's health, safety, welfare or morals." § 250-108.1(A)(4). And this could include everything from "[a] substantial adverse effect on surrounding property values" to "[a]ny other negative impact." § 250-108.1(D)(4)(b), (e).

48.     At the January 10 hearing, several residents of Atlantic Beach voiced concerns about the Village's plans. Multiple residents, for example, asked how the Village planned to pay for acquiring the two parcels and building the proposed facilities. Ex. 1 at 16:21–17:17, 36:2–9, 53:10–12. One speaker, a former comptroller for Long Beach, stated that "financially this is not a sound idea." *Id.* at 51:14–15.

49.     Several residents also questioned why the Village chose to locate a community center on two parcels it needed to acquire through condemnation, rather than at one of several suitable sites it already owned. *Id.* at 18:17–19:21, 48:4–10. They also questioned the need for a community center by noting that when the Village Hall was built, that building "was supposed to be the community center" and currently had both staff and space to serve that function. *Id.* at 20:22-21:6; *see id.* at 48:14-15, 49:10-12.

50.     Another resident questioned where visitors would park and noted that placing a park for "little kids . . . right next to a main street . . . . doesn't make any sense." *Id.* at 30:8–12. Several other speakers echoed the latter concern, observing that 2035 Park Street "doesn't look like an ideal location to have a park" given that "[e]verybody knows about the speeding problems on Park Street." *Id.* at 38:2–4; *see also id.* at 45:18–46:9.

51.     Other residents commented on the conspicuous absence of formal plans—such as detailed renderings or designs—of the proposed park and community center, despite the Village leadership's determination to move forward to take the properties.  A resident, who worked as an Atlantic Beach lifeguard, noted that there had been "no discussion as to what services [the Village's community center] would provide."  *Id.* at 31:25–32:14.  Other speakers raised similar concerns, asking "where are these plans of the community center?" and "[w]hy isn't something displayed here to show me what you're talking about?," *id.* at 52:9–12, and criticizing the fact that "we don't have any specific proposals and we can't ask questions about the price with the acquisition method and . . . what the specifics are for the place," *id.* at 37:19–24.

52.     Several residents also raised concerns about the Village's motivations.  For example, one resident observed that the Property "wasn't interesting for the Village to buy it during those two years" it was on sale, and only attracted the Village's interest "after the Chabad bought it."  *Id.* at 24:6–11.  Another worried about "this subtext about Chabad having purchased the property," *id.* at 38:19–21, while a third described the Village's actions as "so suspicious," *id.* at 49:23.

53.     At the hearing, neither the mayor nor any trustee nor the Village's attorney offered any answers or responses to the questions and concerns speakers had raised.

54.     Those questions and concerns, however, are well grounded.

55.     As several speakers at the public hearing noted, the Village itself owns multiple parcels of land equally if not better suited to a community center.

56.     For example, as illustrated below, in Figure 2, the Village owns two sizable plots near the Park Street Properties.  Both plots are nearer to the beach than the Park Street Properties—indeed, one is beachfront—making them a more logical place to build a lifeguard operations center; both are centrally located in Atlantic Beach, within a block of the Park Street Properties; both already have adjacent parking, something the Park Street Properties lack; and neither is located along as busy a roadway as Park Street.  In addition, on information and belief, the beachfront plot is nearly double the combined size of the Park Street Properties.

**FIGURE 2**



57.     There are also several other plots of land in Atlantic Beach well-suited to the Village's purported plans.   For example, there are multiple plots comprising undeveloped land and/or parking lots located along Ocean Boulevard, in the vicinity of the Village's beachfront plot, as shown below in Figure 3.

**FIGURE 3**



58.    In addition, there are several acres of undeveloped land adjacent to the Atlantic Beach Bridge and Atlantic Beach Fire Station, as shown below in Figure 4, which on information and belief are owned by Nassau County.

**FIGURE 4**



59.     And, as still another option, there is a nearly 3-acre undeveloped property at the intersection of Bay Boulevard and Hamilton and Ithaca Avenues, as shown below in Figure 5.  On information and belief, this property is owned by Nassau County or one of its instrumentalities.

**FIGURE 5**



60.     Because the Village already owns some of these properties, it could at any time have built a community center, lifeguard operations center, and/or park on any of them at much lower expense and without having to undertake lengthy and intrusive eminent domain proceedings.

61.     Similarly, on information and belief, the Village could have purchased or leased the undeveloped properties it does not own at much lower expense than is required to take the Park Street Properties.

62.     But as its attorney acknowledged at the public hearing, the Village did not consider condemning, purchasing, or leasing these or any other parcels as alternatives to condemning the Property.

63.     In the aftermath of the public hearing, several members of the Facebook group "Village of Atlantic Beach Residents," which on information and belief includes Mayor Pappas, expressed openly hostile attitudes towards Chabad.  Comments included:

    a.  "Chabad's first foray into this community was an unlawful, disrespectful and thoughtless religious celebration for their supporters (the majority of whom are not residents).  Perhaps their actions contributed to the sentiment that many of the AB residents do not want or need Chabad." Ex. 2.

    b.  "Let's be real.  The Atlantic Beach community and the Chabad community are two very different things.  Atlantic Beach has been affected by religious agendas for far too long….  The orthodox systematically took over our once excellent school district.  Piece by piece."  Ex. 3.

    c.  "Are they going to have a Christmas event for the local kids?  I am sure they won't….  I have friends who live in a Chabad block and their lives are constantly disrupted.  I bet there will be a preschool (mostly attended by children from across the bridge), religious classes, prayer sessions etc.  Let's be real, NOT inclusive."  Ex. 4.

    d.  "I don't agree with Chabad coming into this village and changing the dynamic here.  Because that is what will happen….  Chabad coming in and trampling all over our beautiful village."  Ex. 5.

64.     Sadly, these comments bore an echo of the opposition of some Village residents, three decades prior, to the construction of an eruv[2] in Atlantic Beach.  At that time, several residents told the *New York Times* that an eruv would lead to the "ghettoization" of the Village as Orthodox Jews moved in from surrounding neighborhoods.  One resident, a then-trustee of the Village, told the *Times*, "We are a small, varied community which has now opened up to a group that has narrowly defined interests. We are not comfortable with the eruv." Ex. 6.

65.     On February 14, 2022, the Village Board voted to proceed with taking both 2025 Park Street and 2035 Park Street through eminent domain.  The minutes of the February 14 meeting reflect that at no point during the meeting did any Village official or representative address the questions and concerns expressed at the January 10 hearing regarding the Village's plans.

66.     The Village Board is the final policy maker for the Village, and its decision to take Chabad of the Beaches' property constitutes the final policymaking authority.

67.     On June 14, 2022, pursuant to § 402 of the New York Eminent Domain Procedural Law (EDPL), the Village filed a petition to acquire fee title to the Property, setting a hearing date of July 14, 2022, "or as soon thereafter as counsel can be heard."

68.     At no point has the Village ever made an offer of just compensation to Chabad for the Property.

---

[2] An eruv is a symbolic boundary that permits observant Jews to carry certain items on the Sabbath and holidays that Jewish law would otherwise forbid them to carry.  An eruv typically consists of a string of fishing line running between utility poles, and is usually not noticeable unless one is specifically looking for it.

69.    At no point has the Village explained why it would not be practicable to have made the offer prior to acquiring the Property, as contemplated by the EDPL.  *See* N.Y. Em. Dom. Proc. Law § 303 ("Wherever practicable, the condemnor shall make the offer prior to acquiring the property and shall also wherever practicable, include within the offer an itemization of the total direct, the total severance or consequential damages and benefits as each may apply to the property.").

70.    At all times relevant to this action, Defendants were acting under the color of state law by exercising the quintessentially governmental power of eminent domain.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### First and Fourteenth Amendments — Free Exercise Clause

### (42 U.S.C. § 1983)

71.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

72.    The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits any state action abridging the free exercise of religion.

73.    A state action that discriminates on the basis of religion is subject to strict scrutiny, and must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

74.    Strict scrutiny also applies to state action that burdens the exercise of religion and that is not generally applicable.  State action that represents individualized assessments, made at government officials' discretion, is not generally applicable.  *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

75.    Animus toward the free exercise of religion is a violation of the Free Exercise Clause.  *Kennedy v. Bremerton Sch. Dist.*, No. 21-418, 2022 WL 2295034, at *9 n.1 (U.S. June 27, 2022) ("A plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that we have 'set aside' such policies without further inquiry.").

76.    Chabad of the Beaches purchased 2025 Park Street to serve as a center for religious worship, religious education, and other forms of outreach to the Jewish community central to Chabad of the Beaches' religious mission.  Indeed, Chabad of the Beaches has already used the Property for this purpose by hosting a menorah lighting there to celebrate Hannukah.

77.    Defendants' decision to take the Property by eminent domain violates Chabad of the Beaches' right to the free exercise of religion in at least two ways.

78.    *First*, Defendants' decision targets Chabad of the Beaches due to religious animus and fails to satisfy strict scrutiny.

79.    Defendants could have purchased 2025 Park Street at any point during the years it was vacant and available for lease or sale.  Yet it was only after Plaintiff purchased

the Property and held a public celebration of Hannukah that Defendants, within just two weeks, decided to take the Property by eminent domain.

80.    Defendants' decision to condemn the Property substantially burdens Chabad of the Beaches' free exercise of religion by preventing Chabad of the Beaches from using the Property for Jewish worship, Jewish education, and other religious activities.

81.    Defendants' purported interest in building a community and lifeguard operations center is pretextual and, in any event, does not constitute a compelling interest.

82.    Furthermore, even if Defendants' interest in building a community and lifeguard operations center were a compelling governmental interest, taking Plaintiff's property is not the least restrictive means of achieving that interest.

83.    As described above, any number of other parcels in the Village—including two owned by the Village itself—are equally if not better suited than the Park Street Properties for its purported plans, and several other suitable parcels are available as well.

84.    Yet, as the Village's eminent domain counsel admitted, the Village did not even consider alternatives to taking the Property.

85.    *Second*, Defendants' decision constitutes non-generally applicable state action that substantially burdens Plaintiff's religious exercise and fails strict scrutiny for the same reasons set forth above.

86.    Defendants' decision is not generally applicable because in exercising the authority to take property by eminent domain, Defendants had discretion to make

individualized assessments.  Specifically, Defendants had the power to target certain parcels (or not), to adjust their plans in response to public comments (or not), and to exempt specific parcels from government action (or not).  Here, Defendants exercised such discretion throughout the condemnation process and decided to target—not exempt—Chabad of the Beaches' property.

87.     As a direct and proximate result of Defendants' conduct, Chabad of the Beaches has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

**SECOND CAUSE OF ACTION**

**First and Fourteenth Amendments — Establishment Clause**

**(42 U.S.C. § 1983)**

88.     Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

89.     The Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits governmental hostility to religion.

90.     The use of eminent domain to take the Property in furtherance of a plan conceived in religious animus is the sort of "removal . . . [that] would be seen by many not as a neutral act but as the manifestation of 'a hostility toward religion that has no place in our Establishment Clause traditions.'" *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019) (quoting *Van Orden v. Perry*, 545 U.S. 677, 704 (2005) (Breyer, J., concurring in judgment)).

91.   Defendants' pretextual taking of the Property due to their hostility to Chabad of the Beaches' religion constitutes hostility to religion in violation of the Establishment Clause.

92.   As a direct and proximate result of Defendants' conduct, Chabad of the Beaches has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

**THIRD CAUSE OF ACTION**

**Fourteenth Amendment — Equal Protection**

**(42 U.S.C. § 1983)**

93.   Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

94.   The Equal Protection Clause of the Fourteenth Amendment forbids state action that discriminates on the basis of religion.

95.   State action violates the Equal Protection Clause when, based on a protected characteristic of a party, such as religion, it treats that party differently from other similarly situated parties and is not narrowly tailored to achieving a compelling government interest.

96.   Defendants' decision to take the Property by eminent domain discriminates against Plaintiff based on its religious beliefs.

97.    Within Atlantic Beach are several similarly situated, undeveloped or minimally developed parcels—including several owned by the Village itself—that would serve the Village's purported purposes as well as, if not better than, Plaintiff's Property.

98.    Defendants, however, did not even consider condemning or using any similarly situated parcels, even though doing so would have cost less than seizing Plaintiff's Property.

99.    Targeting the property of Chabad of the Beaches in this manner is a denial of equal protection of the law.  The Village treated Chabad of the Beaches worse than similarly situated property owners, in a manner demonstrating intent to discriminate against Chabad of the Beaches' use of property for religious purposes.

100.    For the reasons set forth above, Defendants' discriminatory treatment of Chabad of the Beaches neither serves a compelling governmental interest nor is the least restrictive means of achieving Defendants' purported ends.

101.    As a direct and proximate result of Defendants' conduct, Chabad of the Beaches has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Fifth and Fourteenth Amendments — Takings Clause

### (42 U.S.C. § 1983)

102.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

103.    The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, bars the government from depriving private persons of property without a legitimate public use.

104.    Defendants have deprived, and are continuing to deprive, Chabad of the Beaches of its Fifth Amendment rights by failing to establish the requisite "public use" for the taking the Property.

105.    Defendants have violated Chabad of the Beaches' rights under the Takings Clause because their purported public purpose for taking the Property is pretextual, and their true purpose is to prevent Chabad of the Beaches from operating in a highly visible location at the entrance to the Village.

106.    As a direct and proximate result of Defendants' Takings Clause violation, Chabad of the Beaches has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

## FIFTH CAUSE OF ACTION

### Religious Land Use and Institutionalized Persons Act — Substantial Burden

### (42 U.S.C. § 2000cc(a))

107.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

108.    Under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the government may not "impose or implement a land use regulation in a manner that imposes a substantial burden" on religious exercise, unless it shows that

imposing that burden is the "least restrictive means" of furthering a "compelling" interest.  42 U.S.C. § 2000cc(a)(1).

109.    Defendants' decision to take Chabad of the Beaches' Property by eminent domain constitutes a land use regulation under RLUIPA.  Specifically, Defendants' decision to exercise eminent domain to seize Chabad's Property is being done as a proxy for applying the Village's zoning ordinance regulation curtailing religious land uses.  The application of the Village's zoning ordinance by seizing the Property will limit or restrict Chabad of the Beaches' use or development of the Property.

110.    For purposes of RLUIPA, Defendants have burdened Chabad of the Beaches' religious exercise by imposing or implementing a "land use regulation" that involves "individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).  In deciding to take Plaintiff's Property by eminent domain, Defendants have made individualized assessments about how specific parcels may be used and which parcels to take through government action.

111.    Defendants' taking substantially burdens Chabad of the Beaches' religious exercise by preventing Chabad of the Beaches from using the Property for religious worship, religious education, and other activities central to its religious mission.

112.    The substantial burden imposed by Defendants' actions will prevent Chabad from engaging in activities that will affect interstate and foreign commerce.

113.    As set forth above, no compelling interest justifies this substantial burden on Plaintiffs.  Defendants' purported interest in building a community center and

lifeguard operations facility is pretextual, and, even if it were genuine, would not constitute a compelling government interest.

114.    Furthermore, as set forth above, taking the Property is not the "least restrictive means" of achieving Defendants' purported interest.  There are numerous similarly situated parcels offering better, safer, cheaper, and more convenient locations for a community center, yet by Defendants' own admission, they did not consider any as alternatives to taking the Property from Chabad of the Beaches.

115.    As a direct and proximate result of Defendants' RLUIPA violation, Chabad of the Beaches has suffered and will continue to suffer irreparable harm, including the loss of its statutorily protected rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

**SIXTH CAUSE OF ACTION**

**Religious Land Use and Institutionalized Persons Act — Discrimination**

**(42 U.S.C. § 2000cc(b))**

116.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

117.    Under RLUIPA, the government may not "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc(b)(2).

118.    As set forth above, Defendants' decision to take the Property by eminent domain constitutes a "land use regulation" for purposes of RLUIPA.  *Id.*

119.    Defendants' decision to take the Property violates RLUIPA because it discriminates against Chabad of the Beaches on the basis of its religion and religious practices.

120.    As a direct and proximate result of Defendants' RLUIPA violation, Chabad of the Beaches has suffered and will continue to suffer irreparable harm, including the loss of its statutorily protected rights, entitling it to declaratory and injunctive relief, and attorneys' fees.

## PRAYER FOR RELIEF

Chabad of the Beaches respectfully asks the Court to:

1.    Declare that Defendants' decision to take Plaintiff's Property violates Plaintiff's rights under the First, Fifth, and Fourteenth Amendments and under RLUIPA;

2.    Enjoin Defendants from taking any further steps to take Plaintiff's Property through eminent domain proceedings;

3.    Award nominal damages to Plaintiff;

4.    Award actual damages to Plaintiff;

5.    Award Plaintiff attorney's fees and costs under 42 U.S.C. § 1988;

6.    Award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: July 14, 2022                    /s/ David M. Rody
                                        David M. Rody
                                        SIDLEY AUSTIN LLP
                                        787 Seventh Avenue
                                        New York, NY 10019
                                        (212) 839-5951
                                        drody@sidley.com

                                        Gordon D. Todd (*pro hac vice forthcoming*)
                                        Daniel J. Feith (*pro hac vice forthcoming*)
                                        Peter A. Bruland (*pro hac vice forthcoming*)
                                        Robert M. Smith (*pro hac vice forthcoming*)
                                        SIDLEY AUSTIN LLP
                                        1501 K Street NW
                                        Washington, D.C. 20005
                                        (202) 736-8760
                                        gtodd@sidley.com
                                        dfeith@sidley.com
                                        pbruland@sidley.com
                                        robert.m.smith@sidley.com

                                        Matt Bryant
                                        Bryant & Pipenger, LLP
                                        25 Roslyn Rd.
                                        First Floor
                                        Mineola, NY 11501
                                        (516) 243-9908 (O)
                                        (516) 493-9641 (F)
                                        matt@nyrightslaw.com

                                        David J. Hacker (*pro hac vice forthcoming*)
                                        Justin E. Butterfield (*pro hac vice forthcoming*)
                                        Jeremiah G. Dys (*pro hac vice forthcoming*)
                                        Ryan N. Gardner (*pro hac vice forthcoming*)
                                        FIRST LIBERTY INSTITUTE
                                        2001 W. Plano Parkway, Suite 1600
                                        Plano, TX 75075
                                        (469) 440-7585
                                        dhacker@firstliberty.org
                                        jbutterfield@firstliberty.org
                                        jdys@firstliberty.org
                                        rgardner@firstliberty.org

Kelsey M. Flores (*pro hac vice forthcoming*)
Joshua C. McDaniel (*pro hac vice forthcoming*)
HARVARD LAW SCHOOL
RELIGIOUS FREEDOM CLINIC
6 Everett St. WCC-5110
Cambridge, MA 02138
(617) 384-0103
keflores@law.harvard.edu
jmcdaniel@law.harvard.edu

*Counsel for Plaintiff Chabad Lubavitch of the Beaches, Inc.*