UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
CHABAD LUBAVITCH of the BEACHES, INC.,

       Plaintiff,

     -against-                 **ORDER GRANTING**
                                    **PRELIMINARY**
INCORPORATED VILLAGE of ATLANTIC   **INJUNCTION**
BEACH; MAYOR GEORGE PAPPAS; EDWARD A.  22-CV-4141(JS)(ARL)
SULLIVAN; LINDA L. BAESSLER; ANDREW
J. RUBIN; and PATRICIA BEAUMONT,

       Defendants.
--------------------------------------X

APPEARANCES
For Plaintiff:      Peter Bruland, Esq.
                 David M. Rody, Esq.
                 SIDLEY AUSTIN LLP
                 787 Seventh Avenue
                 New York, New York  10019

                 Daniel J. Feith, Esq.
                 Robert M. Smith, Esq.
                 Gordon D. Todd, Esq.
                 SIDLEY AUSTIN LLP
                 1501 K Street NW
                 Washington, District of Columbia  20005

                 Matthew Bryant, Esq.
                 BRYANT & PIPENGER, LLP
                 25 Roslyn Road, 1st Floor
                 Mineola, New York  11501

                 Justin Butterfield, Esq.
                 Jeremiah G. Dys, Esq.
                 Ryan N. Gardner, Esq.
                 David J. Hacker, Esq.
                 FIRST LIBERTY INSTITUTE
                 2001 West Plano Parkway, Suite 1600
                 Plano, Texas  75075

For Defendants:     James Miskiewicz, Esq.
                 GREENBERG TRAURIG
                 900 Stewart Avenue, 5th Floor
                 Garden City, New York  11530

Joshua H. Rikon, Esq.
GOLDSTEIN, RIKON, RIKON, & LEVI, P.C.
381 Park Avenue, South, Suite 901
New York, New York  10016

**SEYBERT, District Judge:**

The impetus for this action is the state court eminent domain proceeding commenced by Defendant Incorporated Village of Atlantic Beach ("Atlantic Beach" or the "Village") regarding property located at 2025 Park Avenue in Atlantic Beach (the "Property").  Plaintiff Chabad Lubavitch of the Beaches, Inc. ("Chabad" or "Plaintiff") brings the instant Section 1983 civil rights action against the Village; Mayor George Pappas ("Mayor"); Edward A. Sullivan ("Sullivan"),[1] Linda L. Baessler ("Baessler"), Andrew J. Rubin ("Rubin"), and Patricia Beaumont ("Beaumont") (collectively, the "Trustees";[2] together with the Village and Mayor, "Defendants") seeking declaratory and injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for Defendants' alleged violation of Chabad's rights under: (1) the Free Exercise Clause and Establishment Clause of the First Amendment; (2) the Takings Clause of the Fifth Amendment; (3) the Equal Protection Clause of the Fourteenth Amendment; and (4) the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),

---

[1]  In addition to being a Village Trustee, Sullivan has also been designated the Village's Deputy Mayor.  (<u>See</u> PI Hr'g Tr. 76:12-77:2.)

[2]  (<u>See</u> Compl. ¶ 18.)

allegedly caused by the Village's eminent domain proceeding.  In conjunction with its Complaint, Chabad moves for preliminary injunctive relief to prevent Atlantic Beach from violating its constitutional rights by using eminent domain to take the Property (hereafter, the "PI Motion").  (See ECF No. 4; see also Support Memo, ECF No. 5.)  Defendants oppose the PI Motion.  (See Opp'n, ECF No. 34.)[3]  For the reasons that follow, the PI Motion is **GRANTED**.




[Remainder of page intentionally left blank.]




_____

[3]  To the extent Defendants seek to supplement their Opposition via their subsequent motion to dismiss (see Dismissal Mot., ECF No. 50, ¶ (ii); see also Dismissal Mot. Support Memo, ECF No. 50-1, Part. V), the Court construes it as an unauthorized sur-reply. (Cf. J.S. Ind. Rule III(D)(1) ("All requests to file rebuttal[s], sur-replies, etc., . . . must be made by letter motions; such requests are granted sparingly."), available at https://www.nyed.uscourts.gov/pub/rules/JS-MLR.pdf.) Accordingly, the Court has not considered that portion of Defendants' submissions herein.

I.   Factual Background[4]

     A.   Atlantic Beach, the Property, the Adjacent Lot, and
          Relevant Neighboring Properties

          1.   Atlantic Beach, Generally

     Atlantic Beach is a beachside community of approximately
2,000 residents.  (See PI Hr'g Tr. 105:19-21.)  It is located on
the western end of the Long Beach Barrier Island on the South Shore
of Long Island in Nassau County.  (See Compl., ECF No. 1, ¶ 16.)
For more than 60 years, since its incorporation, it has operated
without a stand-alone community center (see PI Hr'g Tr. 97:3-5);
its current Village Hall, located at 65 The Plaza in Atlantic Beach
(see Compl. ¶ 16), was rebuilt in the early 2000s (see PI Hr'g Tr.
97:6-9).  The Atlantic Beach Bridge, one of three bridges that
connects the Barrier Island to Long Island, is located in the
Village.  (See id. 12:25-13:5.)

     The Atlantic Beach community has changed, now having
more full-time residents.  (PI Hr'g Tr. 114:3-5.)  Yet, in the
Deputy Mayor's opinion, the Village is dealing with a failing

---

[4]  The Factual Background section is drawn from Chabad's initial
submissions in support of its application for a temporary
restraining order ("TRO") (see ECF No. 4) and the testimony and
evidence submitted at the August 3, 2022 hearing on the PI Motion.
The parties ordered the transcript of the August 3 hearing, which
has been provided to the Court by the court reporter, but which
has not been docketed; hereafter, the transcript will be cited as
"PI Hr'g Tr."

school district.  (See id. 114:5-6.)  Moreover, as a relatively small community, it has limited activities in which people can engage.  (See id. 114:7-10.)  And, like many other American communities, Atlantic Beach is facing drug problems.  (See id. 114:11-16.)  These are some of the alleged reasons that prompted the Village to consider the need for a community center, as further discussed below.

### 2.  The Property & Adjacent Lot, Generally

The Property is located on the north-east corner of a block (the "Block") that is on the south side of Park Avenue, at the south-west intersection of Park Avenue and Albany Boulevard. (See Defs. Ex. G[5] (p. 19 from July 2011 Draft Appraisal Report).) A building and parking lot occupy the Property; the building had been a bank and has an attached drive-through structure.  (PI Hr'g Tr. 14:17.)  Prior to November 2021, the Property was unoccupied for approximately three years and for sale for approximately two years.  (See, e.g., id. 27:4-10, 28:2-11.)  During the period when the Property was for sale, a large "For Sale" sign was erected in front of it which stated, among other things: "NEARLY 20,000 CARS PASS BY EACH DAY."  (Perlstein Decl., ECF No. 8, ¶ 7; see also Ex. 1, attached to Compl.)

---

[5]  Defendants' Exhibit G was admitted into evidence at the August 3, 2022 hearing on Plaintiff's PI Motion.

On the north-west corner of the Block, at the south-east intersection of Park Avenue and The Plaza street, is a vacant lot, known as 2035 Park Street, which is adjacent to the Property (the "Adjacent Lot"). (See Compl. ¶ 56, Fig. 2; Pl. Ex. 6B.[6]) Previously, there had been a building on the Adjacent Lot, but in 2011 the Village had it condemned, razed, and the foundation filled in; it has sat empty since that time. (See PI Hr'g Tr. 80:22-81:15; 112:2-19; 141:18-142:13.)

Together, the Property and the Adjacent Lot comprise all the properties on the Block with frontage on Park Avenue. Further, these two properties lie opposite from (and south to) the base of the Atlantic Beach Bridge, where there are entrance and exit ramps. (See Compl. ¶ 56, Fig. 2; see also PI Hr'g Tr. 11:15-17.) The remaining properties on the Block are owned by the Village. (See PI Hr'g Tr. 43:4-11; 113:7-11; 113:24-114:1.)

3. Relevant Neighboring Properties, Generally

The block which lies parallel and west of the subject Block is the situs for Atlantic Beach's Village Hall and other property owned by the Village. (See PI Hr'g Tr. 114:1-2.) The Village Hall is located approximately in the middle of that block on its easterly side, with a Village-owned lot located to the south of and adjacent to the Village Hall. (See Support Memo, App'x,

---

[6] Plaintiff's Exhibit 6B was admitted into evidence at the August 3, 2022 hearing on Plaintiff's PI Motion.

Fig. 2.) Among other things, the Village Hall has offices and a meeting room that holds approximately one hundred people. As to the office space: The Village's needs have outgrown that space. (See PI Hr'g Tr. 114:17.) As to the meeting room: In it are chairs, which are bolted to the floor and which, therefore, cannot be removed to create an open space. (See id. 116:9-19.) Thus, the Village often resorts to holding large events outdoors. (See id. 143:13-25.)

B.   Chabad's Interest in the Property

Chabad sought to expand its presence on the Barrier Island by establishing a center in Atlantic Beach. Since a main goal of Chabad is to reach out to those members of the Jewish community who "wouldn't necessarily come in to a synagogue" (PI Hr'g Tr. 12:6-12), a highly visible location is very important (see Goodman Decl., ECF No. 7, ¶ 12). Chabad was aware that the Property was for sale for a little more than a year. Because it is in a commercial area on a main thoroughfare to the Barrier Island with a high volume of traffic passing by, making it visible, the Property was attractive to Chabad. (See id. 13:6-19; see also Goodman Decl. ¶ 12.) Further, Chabad was aware that the owner was eager to sell the Property. (See id. 13:12-16.) Chabad purchased the Property on November 18, 2021. (See id. 8:14-16.) It did so without interfacing with the Village.

Soon thereafter, on December 2, 2021, Chabad held a public menorah lighting outside the Property. (Goodman Decl. ¶ 14.) Similar to when it conducts the public menorah lighting ceremony at its neighboring Long Beach location, Chabad extended an invitation to the Village Mayor to attend the menorah lighting ceremony. (Id. ¶ 17.) After calling to relay its invitation the day before the menorah lighting ceremony, as instructed, Chabad also sent an invitation via email to the email address provided by Village personnel. (See Dec. 1, 2021 Email Invitation, Ex. 1, ECF No. 7-1, attached to Goodman Decl.) An unsigned response inquiring about the time of the lighting ceremony was sent (see id.), but neither the Mayor nor any Village official attended (see Goodman Decl. ¶ 20). Chabad contends that "[l]ess than two weeks after the menorah lighting, Atlantic Beach initiated the process of acquiring the Property via eminent domain." (Id. ¶ 21.)

C. The Village's Alleged Interest in the Property and Adjacent Lot

Several months before November 2020, members of the Village's Board of Trustees began discussing acquiring the Property and the Adjacent Lot (jointly the "Properties") (see PI Hr'g Tr. 111:24-112:8) "for the expansion of existing adjacent recreational facilities, the creation of a community center with space for lifeguard beach operations, and the creation of a community park with open space, seating, and landscaping

[(hereafter, the "Proposed Community Center")]." (Opp'n at 2; see also PI Hr'g Tr. 95:21-24.) The Village knew that the Property had been for sale since 2019, but never offered to purchase the Property.[7] (See PI Hr'g Tr. 91:12-17.) Instead, for unexplained reasons, it planned to acquire the Properties by eminent domain.

On November 14, 2020, Deputy Mayor Sullivan had a discussion with condemnation lawyer Joshua Rikon ("Attorney Rikon") about the Properties and sought a proposal from an appraisal company to prepare a report on the market value of the Properties. (See Sullivan Decl., ECF No. 36, ¶ 6.) While that company provided the Village with a proposal on November 20, 2020, the Village did not retain it. Rather, after passing a February 2021 resolution prepared by Attorney Rikon (see PI Hr'g Tr. 88:16-22), the Village retained another appraisal company, the Brunswick Appraisal Corporation ("Brunswick"). (See id. 89:4-10.)

Brunswick submitted a draft appraisal report to the Village in July 2021 (see PI Hr'g Tr. 89:7-15), which the Trustees sent to Attorney Rikon for review (see id. 127:10-128:1). Sometime thereafter, Attorney Rikon drafted a resolution letter for the Village regarding acquisition of the Properties by eminent domain.

---

[7] Nor is there any evidence that the Village ever offered to purchase the Adjacent Lot.

D.    The Alleged Suspect Timing of Events

As stated, Chabad acquired the Property on November 18, 2021 and held its first public menorah lighting at the Property on December 2, 2021.  On December 3, 2021, the Village, through Village counsel, executed an Environmental Assessment Short Form, a necessary step towards a New York State eminent domain taking. (See Pl. Ex. 18;[8] see also, Ex. 6, ECF No. 7-6, at ECF pp. 68-70, attached to Goodman Decl. (same); PI Hr'g Tr. 94:19-96:13.)

On December 10, 2021, and pursuant to applicable state law, the Village noticed an open meeting regarding its proposed taking by eminent domain of the Properties.  Sometime in mid-December 2021, after Chabad received notice of the January 10 open meeting, Rabbi Goodman, who leads the Chabad, had a mutual friend arrange a meeting with the Village Mayor to discuss the Village's acquisition plans. (See PI Hr'g Tr. 24:9-24.)  According to Rabbi Goodman, he and the Mayor met at the Property (see id. 25:5-10); however, while the Mayor was friendly, he was "tight-lipped" regarding the proposed acquisition and indicated he was restrained from commenting on it because of legal proceedings. (See id. 25:15-26:5).  The Mayor never stated he did not like Chabad or express any anti-religious or anti-Semitic views.  Likewise, no Village officials expressed anti-religious or anti-Semitic views.

---

[8] Plaintiff's Exhibit 18 was admitted into evidence at the August 3, 2022 hearing on Plaintiff's PI Motion.

On January 10, 2022, the noticed open meeting was held. It was meant to collect feedback from the Atlantic Beach community regarding the Village's acquisition of the Properties; it was not conducted in a question-and-answer format. (See Jan. 10 Hr'g Tr.,[9] Ex. 2, ECF No. 6-2, 4:12-17; 7:21-24, attached to Todd Decl., ECF No. 6.) Numerous people presented their views on the proposed taking of the Properties; feedback was mixed, with some people supporting the taking and some people opposing it. (See generally Jan. 10 Hr'g Tr.; see also PI Hr'g Tr. 104:11-105:8.) Some questioned the need for the Proposed Community Center when Atlantic Beach's Village Hall could serve that purpose and had staff and space to host gatherings. Others asked why the Village did not build the Proposed Community Center on one of the several vacant lots it already owned, with two such lots located directly across the street from the Village's existing recreational center, which was closer to the beach than the Properties, and adjacent to parking, unlike the Properties. Still other residents questioned the officials' true motives, noting that the only change between when Village officials showed no interest in the Property and when they decided they had to seize it was Chabad's purchase of the Property. (See generally Jan. 10 Hr'g Tr.)

---

[9] The Court cites to the internal page numbers of the January 10, 2022 Hearing Transcript.

Following the January 10 open meeting, in a closed Facebook group page that was designated the "Village of Atlantic Beach Residents" (the "FB Group") and which (1) had 654 members, (2) had as one of its moderators/administrators Trustee Beaumont, and (3) included Deputy Mayor Sullivan as a member, members posted regarding the Village's proposed acquisition of the Properties; several posts were anti-Semitic in nature. (See PI Hr'g Tr. 105:17-106:16; Goodman Decl. ¶ 24 and cited Exs. 2-5 (screenshots of subject posts), attached to Goodman Decl.) In the posts, members commented that "AB residents do not want or need Chabad," whose public menorah lighting was panned as "an unlawful, disrespectful and thoughtless religious celebration," and expressed concern that Chabad's presence would "change the dynamic" in Atlantic Beach and "trampl[e] all over our beautiful village," which "has been affected by religious agendas for far too long."

While Rabbi Goodman is not a member of the FB Group, he became aware of those anti-Semitic posts when, on an undisclosed date, screenshots of some of them were forwarded to him. (See PI Hr'g Tr. 55:15-22; Goodman Decl. ¶ 24.) He was also verbally informed of the anti-Semitic posts. (See id. 55:15-20.) Subsequently, the anti-Semitic posts were deleted; the record does not indicate when that occurred or by whom. Moreover, while Deputy Mayor Sullivan is a member of the FB Group, he testified he: is

not familiar with its composition; does not often visit that Group's page; and, did not become aware of the anti-Semitic posts until he was preparing for the August 3, 2022 hearing on the PI Motion. (See id. 105:12-106:16.)

During the same required 30-day notice period, the Village received letters in support of and opposed to the proposed acquisition of the Properties. (See PI Hr'g Tr. 103:11-105:4.) According to Deputy Mayor Sullivan, approximately 80% of the letters were in support of the Village acquiring the Properties. (See id. 104:21-22.) None of those letters were introduced into evidence.

In February 2022, the Village Trustees voted to take the Properties through eminent domain. (See Feb. 14, 2022 Vill. Br. of Trustee Min., Ex. 3, ECF No. 6-3, at ECF pp. 4-5, attached to Todd Decl.)

E.    Additional Relevant Testimony

Deputy Mayor Sullivan testified generally that he was not familiar with the Chabad organization, but that any religious organization would provide useful services to the community. (See PI Hr'g Tr. 107:14-23; 108:15-16.) He further stated that he was not familiar with whether a religious organization needs to have a special use permit to operate in the Village, but believed such organizations must comply with applicable regulations. (See id. 108:23-109:6.)

As to the eminent domain process generally, Deputy Mayor Sullivan testified that several things had to occur before the Village could acquire the Properties. (See PI Hr'g Tr. 92:6-8; 93:13-18.) For example, among other things, the Village needed to: conduct an environmental study; determine if the acquisition could be financed; have the Properties surveyed; have title searches conducted; and, hold a public hearing after it has been properly advertised. (See id. 128-29.) As to the financing component of the proposed acquisition, Deputy Mayor Sullivan testified that Trustee Rubin worked with the Village's accountant regarding the Village's rating to borrow funds over a 30-year period. (See id.) No direct evidence was introduced to corroborate this testimony.

As to knowledge of Chabad's interest and purchase of the Property, Deputy Mayor Sullivan testified: from the summer of 2021 through November 2021, he had no knowledge that Chabad was in negotiations to purchase the Property; he first heard a rumor that Chabad had purchased the Property on December 2, 2021, the date of the public menorah lighting; when the Village issued its December 10, 2021 open meeting notice regarding the proposed acquisition of the Properties, he had no affirmative knowledge of Chabad's purchase of the Property; he did not receive formal notification of Chabad's purchase of the Property until Chabad requested the Property be exempt from the tax rolls, later in December 2021,

after the December 10 hearing; and, at the next scheduled Board meeting, the Board of Trustees approved Chabad's tax exemption application without incident, as Chabad was entitled to the exemption.  (See PI Hr'g Tr. 132-34; 138:19-139:7.)

II.  Procedural Background

The Village filed its petition for condemnation of the Properties (with corresponding documents) on June 14, 2022 in New York State Supreme Court, Nassau County.  (See Petition, Ex. 6, ECF No. 7-6, attached to Goodman Decl.)  The Village sought a July 14, 2022 hearing on its petition.  (See Compl. ¶ 67.)  Chabad was served with the petition on June 17, 2022.  (See Todd Decl. ¶ 12.)

On July 6, 2022, Chabad's counsel informed the Village's counsel that Chabad planned to initiate a federal action and would be seeking a TRO.  (See Todd Decl. ¶¶ 17-18.)  After several correspondences, "[o]n July 8, 2022, Chabad and Atlantic Beach jointly stipulated to adjourning the return date on Atlantic Beach's state-court petition to July 21, 2022."  (Id. ¶ 24.)  However, when Chabad "did not hear back from the Village with a firm and constructive proposal to resolve the[ir] dispute without litigation by 4 PM on Thursday, July 14, 2022" (id. ¶ 23), but rather "that the Village had decided to proceed with taking 2025 Park Street" (id. ¶ 25), i.e., the Property, it commenced the instant action the same day, as it promised.  (See Case Docket.)

Chabad raises six causes of action:

1. A violation of the Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, and which prohibits any state action abridging the free exercise of religion (see Compl. ¶¶ 71-87);

2. A violation of the Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, and which prohibits governmental hostility to religion (see id. ¶¶ 88-92);

3. A violation of the Equal Protection Clause of the Fourteenth Amendment, because Defendants' decision to take the Property by eminent domain discriminates against Chabad based upon its religious beliefs (see id. ¶¶ 93-101);

4. A violation of the Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, which bars the government from depriving private persons of property without a legitimate public use (see id. ¶¶ 102-06); and

5. Two violations of RLUIPA, which prohibits the government from imposing or implementing a land use regulation: (a) in a manner that imposes a substantial burden on religious exercise (see id. ¶¶ 107-15); and (b) that discriminates against any assembly or institution on the basis of religion or religious denomination (see id. ¶¶ 116-20).

Simultaneously, Chabad moved for an order to show cause ("OSC") why, pursuant to Rule 65 of the Federal Rules of Civil

Procedure, a temporary restraining order ("TRO") and a preliminary injunction should not enter, _i.e._, the PI Motion. (See ECF No. 4;[10] see also Support Memo.) On July 15, 2022, the Court granted the PI Motion to the extent it issued the requested TRO. (See TRO, ECF No. 12 (temporarily restraining the Village from, inter alia, "taking any further action to acquire [the Property] through eminent domain").) Further, the Court directed briefing on the PI Motion and set a hearing on said Motion for July 29, 2022. (See id.) Defendants timely filed their Opposition (see ECF No. 34), to which Chabad replied (see ECF No. 42). Due to its unexpected unavailability on July 29, the Court rescheduled the PI Motion hearing to August 3, 2022 and, for good cause, extended the TRO through that date. (See July 27, 2022 Elec. SCHEDULING ORDER.)

At the August 3, 2022 hearing, Chabad presented evidence and called two witnesses: Rabbi Goodman and Deputy Mayor Sullivan. The Village cross-examined both witnesses and also introduced evidence. Counsel for Chabad and Defendants made closing arguments. At the conclusion of the hearing, the Court took the matter under advisement.

---

[10] (See also ECF No. 12 (Corrected OSC Motion).)

<u>DISCUSSION</u>

I.  <u>Applicable Law</u>

Judge Kuntz recently and succinctly stated the relevant applicable standard:

> "A preliminary injunction is an extraordinary remedy never awarded as of right," but rather only "upon a clear showing that the plaintiff is entitled to such relief." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22-24 (2008); <u>see also</u> <u>Sussman v. Crawford</u>, 488 F.3d 136, 139 (2d Cir. 2007) (explaining preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a <u>clear showing</u>, carries the burden of persuasion") (emphasis in original). Accordingly, courts generally grant preliminary injunctions only "where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" <u>Oeoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.</u>, 769 F.3d 105, 110 (2d Cir. 2014) (quoting <u>Lynch v. City of New York</u>, 589 F.3d 94, 98 (2d Cir. 2009)). However, to obtain a preliminary injunction against "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," <u>id.</u> (quoting <u>Plaza Health Labs., Inc. v. Perales</u>, 878 F.2d 577, 580 (2d Cir. 1989)), a plaintiff cannot rely on the "fair ground for litigation" alternative and must prove likelihood of success on the merits. <u>Id.</u> "This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be

> enjoined lightly." Able v. United States, 44
> F.3d 128, 131 (2d Cir. 1995). The moving party
> also must demonstrate a preliminary injunction
> is in the public interest. Oneida Nation of
> N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011)
> (citing Winter, 555 U.S. at 19–20).

Plaza Motors of Brooklyn, Inc. v. Cuomo, No. 20-CV-4851, 2021 WL 222121, at *4 (E.D.N.Y. Jan. 22, 2021); see also Central Rabbinical Congress of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene, 763 F.3d 183, 192 (2d Cir. 2014) (same). Moreover, the Second Circuit has recognized that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948, at 440 (1973); further citations omitted). "The district court has wide discretion in determining whether to grant a preliminary injunction . . . ." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Moore v. Consol. Edison Co., 409 F.3d 506, 511 (2d Cir. 2005)).

## II. Application

When Chabad sought its TRO, it argued that its evidence strongly suggested the Village acted with discriminatory intent when "within less than a month of Chabad's arrival [in the Village] -- and less than two weeks after Chabad first used the [P]roperty to publicly celebrate a Jewish holiday -- Atlantic Beach decided

to take the [P]roperty through eminent domain, purportedly to build a community center and lifeguard operations facility" "even though the Village already owns at least two undeveloped properties better suited for its purported plans" and owns other properties the Village never considered. (Support Memo at 1.) Moreover, given "the Village's years of inaction and . . . the decades it has gone without a community center or lifeguard operations facility," there "is no true urgency to the Village's plans." (Id. at 2.) Rather, given the sequence of events, Chabad asserted that the "Village has no legitimate interest in pursuing so plainly an unlawful course of conduct." (Id.) Even after the August 3 hearing, the timing of events remains suspect.

A. Likelihood of Success on the Merits

The Court focuses upon Chabad's Free Exercise claim; because it finds that Plaintiff is entitled to injunctive relief on that claim, the Court need not reach Chabad's remaining claims, as "[t]he scope of appropriate injunctive relief would not vary based on the merits of [those] remaining federal . . . claims." Am. Auto. Ass'n, Inc. v. Limage, No. 15-CV-7386, 2016 WL 4508337, at *2 (E.D.N.Y. Aug. 26, 2016) (citing Pretty Girl, Inc. v. Pretty Girl Fashions, Inc., 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011) (finding for the plaintiff on a Lanham Act claim, and declining to reach additional claims because the "scope of the [injunctive] relief sought at this stage . . . is identical regardless of

whether the Plaintiff would be likely to succeed on any of its additional claims")).

"The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion." Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1876 (2021). Where a municipality's actions burden an organization's religious exercise by curtailing its mission, courts must decide whether the burden is constitutionally permissible. See id. Laws or policies that "incidentally burden religion are ordinarily not subject to strict scrutiny . . . . so long as they are neutral and generally applicable." Id. (citing Employ. Div., Dep't Human Res. of Oregon v. Smith, 494 U.S. 872, 878-82 (1990)). However, laws or policies which "do not meet the requirement of being neutral and generally applicable" are subject to strict scrutiny review to withstand constitutional challenges. See id. at 1877; see also Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407, 2422 (2022) ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny."); Central Rabbinical Congress, 763 F.3d at 193 ("A law burdening religious conduct that is not both neutral and generally applicable, however, is subject to strict scrutiny." (citation and emphasis omitted)). "Neutrality and general applicability are interrelated and failure to satisfy one requirement is a likely

indication that the other has not been satisfied." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).

As to the neutrality prong: "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." Fulton, 141 S. Ct. at 1877 (citing Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n, 138 S. Ct. 1719, 1730-32 (2018); Lukumi, 508 U.S. at 533); see also Kennedy, 142 S. Ct. at 2422 ("A government policy will not qualify as neutral if it is specifically directed at . . . religious practice." (cleaned up)). As to the general applicability prong: "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." Id. (quoting Smith, 494 U.S. at 884; cleaned up). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Id.

Here, Chabad is not challenging New York State's eminent domain law, but rather "the Village's decision, adopted by standalone resolution, to seize [the P]roperty." (Reply at 3.) Relying upon the Supreme Court's recent case, Kennedy v. Bremerton School District, Chabad contends "[a] plaintiff may prove a free exercise violation by showing that 'a government entity has

burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.''" (Support Memo at 9 (quoting Kennedy, 142 S. Ct. at 2422).)  In such an instance, "a court 'will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." (Id. (quoting Kennedy).)  According to Chabad, Defendants targeted its members' religious conduct for distinctive treatment, triggering strict scrutiny.  At this juncture, the Court agrees for the following reasons.

Defendants' decision to acquire the Property by eminent domain will burden Chabad's religious exercise by curtailing its outreach mission to the Jewish community (see, e.g., Compl. ¶¶ 22-24, 26, 29; see also Goodman Decl. ¶¶ 5, 10, 12), and by eliminating its highly visible presence in the Village.  Based upon the record evidence, and considering "the historical background of the decision under challenge, the specific series of events leading to [it], and the  . . . administrative history," Lukumi, 508 U.S. at 540, as well as statements made by community members, see Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona, 945 F.3d 83, 111 (2d Cir. 2019) (in the context of an equal protection challenge, also identifying community member statements as a consideration in making the required "sensitive inquiry" about

discriminatory intent),[11] the Village's acquisition decision was made in a manner intolerant of Chabad's members' religious beliefs and which would restrict Chabad's practices because of its religious nature.  Thus, the Village's acquisition decision was targeted and not done neutrally, thereby requiring the Court to apply strict scrutiny in deciding whether that decision is constitutionally permissible.

The combination of the following considerations persuades the Court of Chabad's likelihood of success on its Free Exercise claim.  The Village never inquired from the Property's prior owner whether he was interested in selling the Property (see Perlstein Decl. ¶ 8) notwithstanding it being adjacent to and/or in very close proximity to Village-owned and controlled properties and it having sat vacant for three years, with a prominent "For Sale" sign having been erected in front of the Property for the last two of those three years.  Nor did the Village ever attempt to acquire the Adjacent Lot, either by sale or eminent domain, for the approximate ten years it lay vacant, despite having had the building on it condemned and razed a decade previously and its close proximity to Village-owned and controlled properties. Instead, for vague reasons, not strongly supported by direct

---

[11]  See also Lukumi, 508 at 540 (instructing that "[i]n determining if the object of a law is a neutral one under the Free Exercise Clause, "courts find guidance in our equal protection cases").

evidence, e.g., feasibility studies and/or reports, proposed facility plans, and/or proposed architectural or design plans,[12] the Village's apparent urgency to acquire the Properties intensified during the same time when Chabad purchased the Property.

Moreover, the suspicion of impermissible intent created by the timing of events is amplified by comments made at the January 10 open meeting. For example, the owner of the Adjacent Lot expressed opposition to the acquisition plan, identifying "five other locations the Village could build on and not pay for the land" (Jan. 10 Hr'g Tr. 18:19-20; see also id. 18:21-19:21; 22:10-13). He also questioned the Village's motive in wanting to acquire the Property. (See id. 22:16-21.) Other speakers questioned the Village's timing in wanting to acquire the Property, implying it was discriminatorily motivated, i.e., the Village's interest was whetted once Chabad purchased the Property. (See id. 24:5-16; see also id. 36:22-37:13; 38:16-39:3; 49:12-50:7; 52:3-16.) Some speakers questioned the wisdom of having the Proposed Community Center "right next to a main road" (id. 30:6-12; see also id. 37:25-38:11) and spending money on it in the absence of specific details (see id. 31:8-11; see also id. 37:20-24; 51:9-

---

[12] (But see Jan. 10 Hr'g Tr. 9:2-7 (stating a "rendering of the project is part of th[e January 10] record as Exhibit F").) The "Exhibit F" referenced at the January 10, 2022 open meeting has not been provided to the Court.

19).  A Village lifeguard stated that, based on his "firsthand experience," the Proposed Community Center was "totally unnecessary."  (Id. 32:13-14.)  Notably, both Rabbi Goodman and his wife spoke at the January 10 open meeting, emphasizing that Chabad's goal and that of the Village align, i.e., providing the Village with a community center.  (See, e.g., id. 42:20-45:14.)

Further, the several anti-Semitic comments posted to the FB Group page after the January 10 open meeting, i.e., community-member comments, add to the suspicion caused by the timing of events and call into question the Village's stated motivation for acquiring the Property by eminent domain.  The relevance of those comments are compounded by the fact that Beaumont, one of the Village Trustees, was an administrator/monitor of the FB Group; thus, it is difficult not to conclude that at least one member of the Village Board was aware of several strong opponents to Chabad's presence in the Village, based upon impermissible religious animus.[13]

"While generally the condemnor has no obligation to explain its preference of one site over another in fulfilling a

---

[13] The Court recognizes that, at this nascent stage of litigation, it remains an open question whether the Mayor and the other Trustees were aware of the FB Group comments and whether those comments played any role in the Village's decision to acquire the Property by eminent domain.  However, this does not negate the cumulative effect of the other considerations the Court has identified.

public purpose," Zutt v. State, 99 A.D.3d 85, 105, 949 N.Y.S.2d 402, 417 (N.Y. App. Div., 2d Dep't 2012), where, as here, the Village's selective use of eminent domain to acquire the Property is not neutral, but targeted Chabad for distinctive treatment, it can prevail only if it shows its action "is justified by a compelling interest and is narrowly tailored to advance that interest." Lukumi, 508 U.S. at 533; cf. Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 349 (2d Cir. 2007) (recognizing a government's action that directly coerces" a "religious institution to change its behavior" "imped[es]" that institution's religious exercise and where the governmental action is absolute it likely constitutes a "substantial burden" on free exercise). At this stage, the record evidence -- suspect timing of events, vague plans for the Proposed Community Center, community comments questioning the need for the Proposed Community Center, anti-Semitic community comments, the availability of other properties -- shows otherwise. Thus, the Court rejects Defendants' position that the Village's acquisition "should be permitted to go forward, because it is rationally related to a conceivable public purpose" and "has the incidental effect of burdening [Chabad's] particular religious practice" (Opp'n at 6), and finds the record evidence lends strong support to Chabad likely succeeding on the merits of its Free Exercise claim.

B.    Irreparable Harm

Without injunctive relief, the Property will be lost to Chabad via eminent domain; monetary compensation will not undo the irreparable harm losing the Property will have in curtailing Chabad's free exercise of its religious rights. See Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")); see also generally Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996) ("[T]he denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily." (citations omitted)). In other words, it is not the taking of the Property, but rather the alleged resulting interference with Chabad's constitutional Free Exercise rights, that warrants finding irreparable harm upon the present record. See Hartford Courant Co. v. Carroll, 986 F.3d 211, 224 (2d Cir. 2021) (quoting Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948, at 440 (1973))); see also Jolly, 76 F.3d at 482 ("[I]t is the alleged violation of a constitutional

right that triggers a finding of irreparable harm." (emphasis in original; citations omitted)).

C. <u>The Public Interest and Balancing of Equities</u>

Notwithstanding Defendants' counsel's assertion that Defendants "concede nothing" (PI Hr'g Tr. 164:13-14), Defendants have not meaningfully addressed these two components of the preliminary injunction analysis. (<u>Cf.</u> Opp'n at 9.) Conversely, Chabad argues the public interest favors granting preliminary injunctive relief since "securing First Amendment rights is in the public interest." (Support Memo at 22 (quoting <u>N.Y. Progress & Prot. PAC v. Walsh</u>, 733 F.3d 483, 488 (2d Cir. 2013)); <u>see also id.</u> (stating "[i]t is always in the public interest to prevent the violation of a party's constitutional rights" (quoting <u>Melendres v. Arpaio</u>, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up)).) The Court agrees; whatever the ultimate outcome of this action, there can be little doubt that it is in the public's interest for government actors to adhere to the rule of law, including protecting all persons' First Amendment rights. <u>See, e.g.</u>, <u>Walsh</u>, 733 F.3d at 488 ("[T]he Government does not have an interest in the enforcement of an unconstitutional law.").

Chabad further asserts that while denying preliminary relief will irreparably harm it, granting such relief, thereby preserving the <u>status quo</u>, would not harm Atlantic Beach. (<u>See</u> Support Memo at 22-23.) As Chabad aptly argues:

> [s]ince its incorporation in 1962, Atlantic
> Beach has gone sixty years without the planned
> facilities, and it showed no serious interest
> in building them during the years [the
> Property] was vacant and for sale. In
> addition, the Village already has meeting
> space for community groups . . . . And, in
> all events, preliminary relief would not stop
> Atlantic Beach from developing land that it
> already owns.

(Id. at 23.) The Village has not countered this argument, and the Court cannot discern how a delay caused by this action tips the equities in favor of the Village. Indeed, "under the EDPL,[14]the municipality holds nearly all the cards, with any aggrieved party having little right to participate in the initial determination and limited right to judicial review thereafter." Buffalo S. R.R. v. Vill. of Croton-on-Hudson, 434 F. Supp. 2d 241, 254 (S.D.N.Y. 2006) (citing Brody v. Vill. of Port Chester, 434 F.3d 121, 132-34 (2d Cir. 2005)); see also In re City of N.Y., 847 N.E.2d 1166, 1171 (N.Y. 2006) (stating that if a state court is "satisfied that the condemnor has met all of the EDPL's procedural requirements, it must grant the [vesting] petition"). Moreover, "a preliminary injunction would not stop Defendants from building new recreational facilities at one of the [other] parcels it already owns." (Reply at 10.) The Village has options to proceed even in the face of a preliminary injunctive; Chabad does not and faces

---

14  "EDPL" is an acronym for New York State's Eminent Domain Procedure Law.

the risk of losing its highly visible location on Park Avenue opposite the Atlantic Beach Bridge.  Thus, the balance of equities favor Chabad.  See <u>Buffalo</u>, 434 F. Supp. 2d at 254 ("Only intervention by a court early in the condemnation process can stave off a taking that the Village is determined to make.").

<u>CONCLUSION</u>

Accordingly, **IT IS ORDERED** that Chabad's PI Motion (ECF No. 4) is **GRANTED** to the extent that Defendants are preliminarily enjoined from taking any further steps to take Chabad's Property by eminent domain pending final resolution of Chabad's Complaint.

**SO ORDERED.**

                              /s/ JOANNA SEYBERT
                              Joanna Seybert, U.S.D.J.

Dated:      September  6 , 2022
            Central Islip, New York